NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0515n.06

No. 23-5240

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Dec 11, 2023
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| JUDITH COLLINS, individually and as executor of the estate of Michael N. Collins, | ) ) ) | |
| Plaintiff-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| v. | ) ) ) | |
| UNITED STATES OF AMERICA, | ) | |
| Defendant-Appellee. | ) ) ) | OPINION |

Before: BATCHELDER, GRIFFIN, and LARSEN, Circuit Judges.

**ALICE M. BATCHELDER**, **Circuit Judge**. Judith Collins appeals the district court's grant of summary judgment to the government on Collins's medical malpractice claim brought under the Federal Tort Claims Act (FTCA). Mrs. Collins alleged that the Veteran's Affairs (VA) doctors in Hazard and Lexington, Kentucky, breached the standard of care when treating her late husband. On appeal, she argues that her proffered medical expert established the relevant standard of care for lung cancer treatment, and the district court erred by finding that the expert did not. We **AFFIRM**.

I.      **Background and Procedural History**

Michael Collins smoked a pack of cigarettes a day for 47 years. He passed away on January 19, 2020, at the age of 67. Mr. Collins primarily received care at a VA outpatient clinic in Hazard, Kentucky, and he occasionally visited the VA Medical Center in Lexington, Kentucky.

Relevant to this appeal, Mr. Collins's medical history begins in September 2014, when he received a chest x-ray, revealing a "clear chest" with no "acute cardiopulmonary pathology.[1] Then, from 2015-17, Mr. Collins saw doctors John Furcolow and Billy Banks who each counseled Collins to stop smoking. In 2016, Dr. Furcolow administered chest x-rays, which still reported a clear chest. In 2017, Dr. Banks dispensed nicotine gum to Mr. Collins to curb his smoking addiction. Later, in June and July of 2019, Mr. Collins saw Nurse Kim Gayheart to whom he complained of coughing and congestion. In August, Mr. Collins went back to Dr. Banks and told Dr. Banks that his coughing and congestion had improved. In September, Mr. Collins told Dr. Banks that his breathing had returned to a baseline level and that he had no chest pain, shortness of breath, coughing, or wheezing.

In December 2019, Mr. Collins's health rapidly deteriorated. That month, Mr. Collins went to the Lexington VA Medical Center emergency department with transient neurological deficits. He was transferred to the Lexington VA Medical Center where he was diagnosed with atrial fibrillation, treated with blood thinner, and discharged. A short time later, Mr. Collins coughed up blood and returned to the emergency center where a CT scan revealed a right lung mass. On January 16, 2020, at the Lexington VA Medical Center, Mr. Collins underwent a bronchoscopy with endobronchial ultrasound and endobronchial biopsy for the mass.

After returning home, Mr. Collins coughed up blood again. He went to Whitesburg Appalachian Regional Hospital. Whitesburg transported him to the Lexington VA Medical Center by ambulance on January 17 where, upon arrival, he began having a massive hemoptysis with significant respiratory distress. He was emergently intubated. The VA determined that there was a

---

[1] Mr. Collins also experienced lower back pain, mixed hyperlipidemia, hypertension, and chronic obstructive pulmonary disease at various times during his visits to the VA.

clot on his lung mass, and his bronchoscopy and biopsy revealed that he had stage IIIc or IVa squamous cell carcinoma. On January 19, Mr. Collins was transported to the University of Kentucky Medical Center. He died later that day from a large-volume pulmonary hemorrhage.

Judith Collins brought suit against the United States on behalf of herself and her husband's estate, asserting a medical malpractice action under the FTCA, 28 U.S.C. § 2671. She argued that if Mr. Collins's VA primary care physicians had provided low-dose computed tomography (LDCT) scans, Mr. Collins's cancer would have been detected earlier, furthering his life, and preventing subsequent complications that led to his death.

In 2013, the U.S. Preventative Services Task Force and the American Cancer Society issued similar recommendations, stating that 55 to 80-year-olds with a 30-pack-year smoking history who currently smoke or have quit within 15 years should get annual lung cancer screenings with LDCTs. And in 2014, the Task Force created a shared decision making document for lung cancer screenings outlining the recommendations for lung cancer annual screenings, but it is unclear how it was distributed. In 2015, the Centers for Medicare and Medicaid Services decided to adopt similar recommendations for lung cancer screening with LDCTs. The VA National Leadership Council approved recommendations for lung cancer screening with LDCTs in August 2016.

The Lexington VA Medical Center began the process of purchasing an LDCT scanning machine in 2016. It was installed in 2017, becoming operational in 2018. In September 2018, the VA had a preplanning meeting to discuss LDCT implementation, and LDCT scans became available there in January 2019.

In discovery, Mrs. Collins offered Dr. John Daniel as her medical expert to establish the standard of care in Kentucky for LDTC scans, setting out the basis of her claim. The government moved to exclude Dr. Daniel's testimony and, alternatively, for summary judgment. The district

court did not exclude Dr. Daniel's testimony; rather the court discussed Dr. Daniel's qualifications, his testimony, and then considered whether Dr. Daniel's testimony established the standard of care.

The district court explained that Dr. Daniel principally relied on secondary sources discussing screening recommendations when asked about what established the standard of care for primary care providers. And as for the sources Dr. Daniel relied on, the district court highlighted that Dr. Daniel stated that recommendations "could be the goal, but they're not . . . the standard." *Collins v. United States*, No. 5:22-008-DCR, 2023 WL 2394638, at *4 (E.D. Ky. Mar. 7, 2023). The district court also pointed out that Dr. Daniel did not have any knowledge about how the VA was going to implement LDCT lung cancer screening.

The district court explained that Dr. Daniel did not cite "any facts supporting his assertion that the accepted standard of care for reasonable primary care providers during the relevant period was to order yearly LDCTs for patients like Collins." *Collins*, 2023 WL 2394638, at *5. The court pointed out that Dr. Daniel did not discuss LDCT screening with his own patients. Dr. Daniel did not know how the availability of LDCTs affected the standard of care. He did not provide information on whether LDCTs were available in the surrounding area or in more remote locations. And he conceded that he was unaware of the University of Kentucky Medical Center's use of LDCTs. The district court explained that Dr. Daniel may have suggested that the VA "lagg[ed] behind" its counterparts, but he did not establish the standard of care. *Id.* The district court granted summary judgment to the government, and Mrs. Collins appealed.

## II.     Legal Standard

We review the district court's grant of summary judgment de novo. *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 872 (6th Cir. 2020). Summary judgment is appropriate where the movant demonstrates that there is no "genuine dispute" regarding any "material fact," and the movant is

entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Essentially, we look to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). And while reviewing a motion for summary judgment, we view the evidence and all inferences drawn from the facts "in the light most favorable" to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted).

## III.    Discussion

Mrs. Collins argues that the district court erred by holding that her expert did not establish the relevant standard of care for this FTCA Kentucky medical malpractice suit.[2] Because we conclude that Mrs. Collins's expert did not establish the relevant standard of care in this action, we affirm the district court's opinion.[3]

In lawsuits under the FTCA, the United States stands in as a party to the suit. *See* 28 U.S.C. § 1346. "The FTCA was designed . . . to remove the sovereign immunity of the United States from suits in tort." *Millbrook v. United States*, 569 U.S. 50, 52 (2013). And when a suit is brought under the FTCA, the substantive law of the state in which the allegedly tortious conduct occurred controls. 28 U.S.C. § 1346(b)(1); *see also Mynatt v. United States*, 45 F.4th 889, 895 (6th Cir. 2022). Therefore, because Collins brought her medical malpractice claim in Kentucky, the substantive law of Kentucky governs.

---

[2] Collins also argues that the District Court erred by concluding that her expert was not qualified and excluding his testimony. This argument is meritless as the District Court did *not* exclude Collins's proffered expert. *See Collins*, 2023 WL 2394638, at *3–4 (discussing the expert's qualifications, implicitly recognizing that he was qualified).

[3] Collins further argues that the district court should have had a *Daubert* hearing if the court wanted more information as to her expert and his reliability. But Collins should have requested such a hearing after the government first moved to exclude her expert witness. In any event, the court did not exclude the expert witness. This argument also lacks merit.

To establish a medical malpractice case in Kentucky, plaintiffs must put forth expert testimony to establish the relevant standard of care. *Blankenship v. Collier*, 302 S.W.3d 665, 667 (Ky. 2010).[4] The expert must prove that the medical practitioner provided care that was below the degree of care and skill expected of a reasonably competent practitioner of the same class and in similar circumstances. *Hyman & Armstrong, P.S.C. v. Gunderson*, 279 S.W.3d 93, 113 (Ky. 2008).[5] In Kentucky, the standard of care for medical professionals is established by the medical profession itself, considering "elements of locality, availability of facilities, specialization or general practice, proximity of specialists and special facilities as well as other relevant considerations." *Blair v. Eblen*, 461 S.W.2d 370, 373 (Ky. Ct. App. 1970) (explaining that the standard is a professional, not community, standard); *see also Lake Cumberland Reg'l Hosp., LLC v. Adams*, 536 S.W.3d 683, 695 (Ky. 2017) (explaining the duty "to exercise that degree of care ordinarily used by hospitals under circumstances like or similar to those shown in this case" (citation omitted)).

Here, the district court found that Dr. Daniel did not establish the relevant standard of care for lung cancer screenings with LDCTs. We agree. The district court explained that Dr. Daniel relied on recommendations and secondary sources, rather than his own experience, to opine on the standard of care. *See Collins*, 2023 WL 2394638, at *3–5 (explaining secondary source reliance, lack of experience, and recommendations reliance, respectively). Even Dr. Daniel acknowledged that recommendations will not always establish a standard of care. The district court further explained that Dr. Daniel did not address "the screening practices of other primary care providers

---

[4] Kentucky law recognizes that "no expert testimony is needed in situations 'where the common knowledge or experience of laymen is extensive enough to recognize or to infer negligence from the facts.'" *Vance ex rel. Hammons v. United States*, 90 F.3d 1145, 1148 (6th Cir. 1996) (quoting *Perkins v. Hausladen*, 828 S.W.2d 652, 655–56 (Ky. 1992)).

[5] The medical expert must also establish causation, i.e., that the negligence was the proximate cause of the plaintiff's injury. *Reams v. Stutler*, 642 S.W.2d 586, 588 (Ky. 1982). Here, Dr. Daniel did not testify to causation.

in Kentucky or elsewhere." *Collins*, 2023 WL 2394638, at *5. Moreover, Dr. Daniel did not discuss the availability of LDCTs in the community or in more remote locations.[6] Dr. Daniel did not know whether the University of Kentucky's medical center, a leading research hospital in Kentucky, had LDCT scanning availability.

Dr. Daniel's testimony did not establish the relevant standard of care for medical malpractice in Kentucky. His reliance on recommendations, by his own admission, is not enough to establish a standard of care. *Cf. Lake Cumberland Reg'l Hosp., LLC*, 536 S.W.3d at 696 (explaining that even a hospital's bylaws will not establish the standard of care for a given hospital). Under Kentucky law, a medical expert must discuss locality, facility availability, specialization or general practice, and proximity of specialists and special facilities, amongst other relevant inquiries. *Blair*, 461 S.W.2d at 373. Dr. Daniel did not testify to his own experience with LDCTs, LDCT availability in Kentucky at large or in remote locations of Kentucky, or even whether Kentucky's lead research hospital had LDCTs. As the district court explained, Dr. Daniel may have suggested that the VA lagged behind other hospitals, but his testimony was not sufficient to establish the standard of care for lung cancer screenings with LDCTs. Mrs. Collins therefore failed to establish this element of a medical malpractice claim.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment to the United States.

---

[6] In dicta, the district court elaborated that the United States's medical expert did more to establish the standard of care than did Collins's proffered medical expert. *Collins*, 2023 WL 2394638, at *5. The district court analyzed Dr. Jeffrey Honeycutt's testimony in light of the Kentucky rules for establishing the standard of care, finding that Honeycutt's testimony discussed factors relevant to the standard of care analysis including that LDCTs were not commonly available at the time, and the VA did not actually have one operational until 2019, *id.*, long after the time that Mrs. Collins contends the standard of care required the LDCT scans. In other words, Dr. Honeycutt testified as to the standard of care for a competent medical practitioner of the same class and under similar circumstances. *Hyman & Armstrong, P.S.C.*, 279 S.W.3d at 113.